FILED

08/20/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2018

## IN RE AVA H.

**Appeal from the Juvenile Court for Knox County**
**No. 169338      Timothy Irwin, Judge**

---

## No. E2018-00042-COA-R3-PT

---

Adam R. P. ("Father") appeals the order of the Juvenile Court for Knox County ("the Juvenile Court") terminating his parental rights to the minor child Ava H. ("the Child") after finding and holding that clear and convincing evidence had been proven that grounds existed to terminate Father's parental rights for abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv) and that it was in the Child's best interest for Father's parental rights to be terminated. We find and hold that grounds were proven by clear and convincing evidence to terminate Father's parental rights and that it was proven by clear and convincing evidence that it was in the Child's best interest for Father's parental rights to be terminated. We, therefore, affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Anna East Corcoran, Knoxville, Tennessee, for the appellant, Adam R. P.

Jennifer S. Bjornstad, Knoxville, Tennessee, for the appellees, Carol L. D. and Joshua M. D.

# OPINION

## Background

The Child was born in July of 2013 out-of-wedlock. Mother was having relations with both Father and Joshua M. D. ("Step-father") at the time that Mother became pregnant with the Child. Although Mother was not involved with Step-father at the time of the Child's birth, Step-father attended the birth and was listed as the Child's father on the birth certificate. Mother married Step-father in February of 2017. In July of 2017, Mother and Step-father filed a petition seeking to terminate Father's parental rights to the Child. The case proceeded to trial in December of 2017.

Mother testified at trial that when she learned she was pregnant, she notified Father that he might be the Child's father. Mother stated that Father:

> became very aggressive, scared me. So the police was called and then - - . . . He was just very aggressive, he was told to get out of the house because he was violent, throwing a chair and a table, and he would just knock on a window for hours on end until I finally was brave enough to call the police, and I called a friend of mine to come help. But the police came. After he was escorted off the property.

Mother did not have contact with Father again until 2015.

Step-father had a DNA test done before the Child was a year old so that he could have visitation. Mother testified that this DNA test was done in late 2013 or early 2014, and revealed that Step-father was not the Child's biological father. Mother then waited until August of 2015 before she notified Father that he was the Child's father. She stated: "Which he was notified when I was pregnant, yes, but his actions scared me, so yes."

When asked what caused her to have contact with Father again in 2015, Mother stated: "Because I guess I just had guilt as a mother, I didn't want her to be kept away from her biological father after we had the DNA test with [Step-father], saying he was not the father." So Mother told Father that he was the Child's biological father. She testified that this resulted in an incident, and Father became "very violent, aggressive behavior, just to where it scared me and that's why I kind of kept it inside, I didn't push visitation at that point because I was scared for my daughter." Mother testified:

> [Father], once again, stopped at my house, banging on the windows, demanded to see his daughter at that point, in 2015, so the cops were called since he wouldn't get off my property. He kept threatening he was going to

2

come over to take [the Child], so the place [sic] came then and did a police report.

Mother testified that she obtained an order of protection after this incident.

After this incident, Father went to court and had a DNA test done that established he is the Child's biological father. In January of 2017, the parties entered into a mediated agreement allowing Father supervised visitation with the Child. Mother testified that it took Father approximately five months after the mediation to set up a visitation. The parties had a second mediation in March of 2017, which occurred before Father had any visitation. The March 2017 mediated agreement provided that Father would have "week on, week off" visitations with The Assurance Group ("TAG") and Camelot Care Centers in Cookeville ("Camelot") because Mother was living in Crossville and having to travel for visitations to Knoxville where Father resided. The agreement also provided that Father was to pay $100 per month in child support. Mother stated that Father has paid only $400 total in child support since the first mediation.

Mother stated that she was cooperative with TAG about the visitations. In September of 2016, Mother told TAG that Father could not have visitation until he completed a drug screen. Mother cancelled one of Father's visitations through TAG because the Child had pneumonia. Mother testified that Father then cancelled the TAG visits altogether. Mother stated: "he said I refuse to work with TAG." Mother testified that one of the visitations through Camelot was cancelled due to someone at Camelot being sick. Father last saw the Child in June of 2017. Father has been incarcerated since August of 2017.

Mother had text conversations with Father's step-mother in the summer of 2016 trying to set up visitation, but the visitation never happened. Father's step-mother never has met the Child.

Step-father has been a part of the Child's life since she was two years old. Mother explained that Step-father was in the Child's life when she was born, but after the DNA test was done proving that he was not the biological father he "kind of stepped back a little bit at that time, but he came back in the picture when she was two and has been there since."

Mother and the Child have lived with Step-father in the Crossville area since October of 2016. Mother works for Covenant Health in x-ray and nuclear medicine. Step-father is a foreman with Deem, which puts refrigeration in grocery stores, and has held this job for approximately three years. Mother, Step-father, and the Child live in a three-bedroom, two-bathroom house. Mother testified that the Child "is really crazy

3

about [Step-father], she loves him to death, . . . and that's her dad, for all she knows, that is her dad. . . . She calls him daddy."

Mother was asked why she and Step-father filed the petition seeking to terminate Father's parental rights, and she stated: "Just her protection. I'm scared for her rights, I'm scared for her around [Father], especially his violent history, and just the love between [Step-father] and [the Child] his [sic] undeniable so - - and it's a stable environment for her."

Amy Collier from Camelot testified at trial that she does family preservation services, and for this case she supervised the Child's visitations with Father. Father called Camelot in March of 2017 to set up the initial visitation. Camelot scheduled the first visit for March 21, 2017 in Cookeville. That first visit occurred at a Burger King and lasted for 30 minutes. Ms. Collier stated: "[Father] and [Mother] had gotten into like a verbal altercation and it was upsetting [the Child], so I said it was over. And [Father] came back to the office with us to fill out the paperwork we needed from him." Ms. Collier did not hear what Father and Mother were fighting about as Father had asked Mother to "step over to talk" and he "pulled [Mother] over to the side, like the other side of the play place." Ms. Collier stated: "They were out of earshot of me so I couldn't hear what they were saying."

Ms. Collier testified that the next visit through Camelot was two weeks later at the Camelot office. She stated: "That visit went fine. They sat in our waiting room and played with toys that we had provided. He had lunch brought to [the Child], and he had had a toy brought to [the Child], and they interacted with one another, they played with blocks."

After that visit, Camelot began to have issues with Father. Ms. Collier explained:

The next visit that was scheduled, [the Child] was sick with pneumonia. We had a note from the doctor's office faxed to us [sic] morning, and I had called [Father] just as early as I could because I knew he was commuting from Knoxville to Cookeville. And after that visit - - I didn't hear from him until like later that afternoon. He just became very verbally aggressive over the phone, he was calling my supervisor and our regional director and was just very ugly on the phone with them. And it was at that point that my boss gave me the permission to terminate our services with [Father].

When Ms. Collier was questioned further about what Father did that was aggressive, she stated:

4

Well, he threatened to sue our office, he had threatened to call whoever was over Camelot, because every time we would tell him we couldn't do something a certain way, he would like blow up and would threaten to sue us. He was very difficult to work with. . . . There were a few times on the phone he had called me a stupid bitch. I guess that was kind of the extent of cursing, telling me that I wasn't doing my fucking job, and that I needed to get my head out of my ass, things like that. But it would always come up after - - he had issues with us scheduling the visits at our office, in a controlled environment in the office. But just with his unpredictability, my supervisor and my boss wouldn't allow me to schedule them at a park or at a children's museum. I mean, there are limited places in Cookeville we could have done these visits.

When asked if Mother was cooperative, Ms. Collier stated: "Very, yes." She stated that Mother "always went above and beyond to work with us to schedule." The visit that was cancelled when the Child was sick was scheduled for May 3, 2017. Camelot terminated the visits by letter dated May 8, 2017.

Step-father testified at trial that he thought he was the Child's biological father when he signed the birth certificate. He is 28 years old, and Mother is 29 years old. Step-father testified that he never has had a drug or alcohol problem and that he has no criminal history. He testified that he makes approximately $53,000 or $54,000 per year. Mother makes approximately $25,000 per year. Step-father has no other children.

Step-father wants to adopt the Child. When asked why he wants to adopt, he stated: "Because I raise her as my own now, I take care of her, I'm her dad." When he was asked why this is in the Child's best interest Step-father stated: "Because I'm stable, I love her, I make sure she knows she's loved and cared for, I make sure she's got a roof over her head and food in her stomach."

Father testified at trial that he is from North Carolina. At the time of trial, Father was incarcerated in Tennessee.

Father was asked about how he found out he was the Child's father, and he stated: "[Mother] came over to my house one weekend, I actually had a client over, and she came before I was going to head to Asheville to see my family." He was asked if he could recall if the police were called, and he stated: "No, I didn't - - I called from my house. I asked if I could swing by and see [the Child] afterwards and got no reply, so I went on to Asheville." Father was asked what he did after learning he was the Child's father, and he stated:

> After she told me, she said she's going to let me absorb this and to text her later that night, that she would get back to [the Child]. And I tried for about three days, I probably sent four text messages, and I think the third day I sent one saying that, you know, because you told me I had a daughter, I am going to seek an attorney and get paternity. . . . After a sheriff came to my door the next day for saying that, saying that I had an order of protection hearing.

Father then filed for paternity with the court and had a DNA test done.

Father has a criminal history that precedes the birth of the Child in 2013. In 1999, Father was convicted of reckless driving, evading arrest, and carrying a concealed weapon. In 2006, Father was convicted of a possession charge and a charge of resisting an officer. In 2007, Father was convicted of possession of a Schedule II drug and DWI. In 2008, Father was convicted of drunk and disorderly conduct. In 2009, Father was convicted of DWI.

In February of 2016, Father was charged with driving under the influence in Knox County, and he pled guilty to public intoxication. In July of 2016, Father again was charged with driving under the influence. He pled guilty to that charge in August of 2017.

Father was taken into custody around June 21, 2017. Father was not able to bond out of jail because he was incarcerated for violation of probation until April 12 on the DUI charge. Father was asked if he acknowledged that he has some issues, and he stated: "I think that's an understatement."

At the time of trial Father had seven charges pending that had been bound over to the Grand Jury. These charges arise out of an incident wherein Father was arrested in May of 2017. Father admitted that he was charged with two counts of aggravated assault involving two different victims in connection with this incident. In June of 2017, Father was again arrested and charged with aggravated assault. Father admitted that this charge was domestic and that the incident occurred at his home. Father also was charged with a second charge of aggravated assault arising from the same incident, but Father stated that it wasn't his home and that the officers just assumed it was. Father also was charged with three counts of carrying a handgun as a felon. Father stated that the handgun was not in his possession. When specifically questioned about the incidents resulting in these seven pending charges, Father relied on the Fifth Amendment and refused to answer other questions.

When asked how many times he has visited with the Child, Father stated "Probably four to five. Not enough." He stated: "I tried to like the time - - I mean, I tried many times, my step mom has tried many times. It's really took a toll on me."

Father testified that he works at a barber shop. He testified that his income the past two years has been "in the negative . . . ." He further stated: "I think it was about negative 13 grand last year." Father was asked how he was living on a negative income, and he stated: "I mean, in expenditures. My dad passed away, and I was left assets and such from that, but that's went into two years of the business and starting it up."

Father was asked if he has had treatment for alcohol use, and he testified that he was starting Focus on January 8, 2018 in Knoxville and that he took a 12 hour class at the Sheriff's Office and obtained a certificate. Father explained that Focus is a faith-based 90-day long program that explores things from parenting to work development to everyday life and relationships. Father was asked if he was admitting that since incurring the first charges in 1999 he has not had any treatment for substance abuse, and he stated: "I'm saying after the treatment for the case of the DUI, I mean, yeah, I had some class hours and stuff then, but evidently it didn't take it's toll so . . . ."

Father has been in jail this time for six months. He currently is in a Personal Contemplation Group, which he stated "is thinking before acting and self-exploration." Father has not done any alcohol-related work. He stated that he was trying to get into AA, but there was a long list and that he had been declassified because he had been moved.

Father was asked if TAG terminated their services, and he stated: "No, I terminated services." Father stated that he did this before Camelot terminated services. Father was asked if he sought further court hearings or mediations to get some kind of visitation with the Child after Camelot terminated services, and he stated: "I wanted to get something permanent and I didn't even see why I needed supervised." Father stated: "I did all sorts with the court. . . . I planned on talking - - I got rid of my lawyer, and I took on services of - - . . . ." Father was asked to clarify if since May of 2017 any further proceedings have taken place with him seeking further visitation, and he stated: "No, because also the mediated agreement, she was not given the medical records of [the Child]."

Father was asked if he was requested to take a drug test in connection with visitation, and he stated:

> Really wasn't requested. She said that in a [sic] e-mail and stuff the
> lady asked if I had a court order or anything asking if I had to take a drug

7

test, and I said no. And she said, well, she's saying that you failed one and you don't get visitation, you need to take another one. So I just decided to go take a drug test and send it in. . . . Just to - - it seemed like she was going to use that or that was going to be the next step anyway, so I just went ahead and got it done.

Father has seen the Child five times and each of those times was in 2017. The Child was three years old when Father saw her. Three visits were set up through Camelot, and two of those were completed. Three visits were set up at TAG, and all three were completed.

Father testified that he can prove he paid $500 in child support and stated he thought "there's a couple of more in there, but that I can prove, 500."

Father was asked what type of relationship he has with the Child, and he stated:

I have just - - my feelings have been restricted. It's just - - it's hard to have someone, you know, all a sudden say you have a child in your life and, I mean, I took it as a blessing, and then I get these visitations or these hours, and people are telling me that I can't even tell her I'm her dad.

After trial, the Juvenile Court entered its order on July 17, 2017 terminating Father's parental rights to the Child after finding and holding by clear and convincing evidence, *inter alia*:

The parents entered into a Mediated Agreement through Fourth Circuit Court on January 10, 2017, wherein the father was awarded eight weeks of supervised visitation to be supervised by The Assurance Group (TAG), the parents agreed to submit to mental health assessments at Helen Ross McNabb, and the father agreed to pay child support in the amount of $100 on January 15th and February 15th of 2017 without a presumption of correctness. The parties entered into a second Mediated Agreement on March 13, 2017, wherein the father was awarded weekly supervised visitation to be supervised alternately by TAG and Camelot in Cookeville, Tennessee, and the father agreed to pay $100 per month in child support on the 15th day of each month without a presumption of correctness. The father's first and only visit supervised by TAG took place on March 15, 2017, and then the father terminated services with TAG. The father's the [sic] first visit with Camelot was held on March 21, 2017 for approximately 30 minutes at Burger King. The father had a visit approximately two weeks later with Camelot supervising at the Camelot office for two hours that

went well. The visitation services by Camelot were terminated by Camelot on May 8, 2017, due to the father's behaviors and aggression. The father paid a total of $500 according to the father's step-mother and $400 according to the mother for child support from January 2017 to the present. The father testified that he has had a $13,000 loss the last two years as his income. The Court found that although he has paid some child support, the amount is not significant. A third mediation was scheduled for June 13, 2017, but was cancelled and has not been rescheduled at this point[.]

The father has a lengthy criminal history in Buncombe County, North Carolina and based on his testimony, he admitted to being convicted of the following:

a. Date Committed: 2/7/99- Speeding Elude Arrest or/Attempt
b. Date Committed: 2/7/99-Reckless Driving
c. Date Committed: 2/7/99-Carry Concealed Weapon
d. Date Committed: 2/7/99- Fail to Heed to Light/Siren
e. Date Committed: 1/1/07-DWI Level 2
f. Date Committed: 1/1/07-Possession WITS Schedule II
g. Date Committed: 11/30/06-Resisting Officer
h. Date Committed: 11/30/06-Drug Para-Use/Possess
i. Date Committed: 10/11/08-Drunk & Disorderly
j. Date Committed: 6/18/09-Driv License Revoked
k. Date Committed: 6/18/09-DWI Level 1
l. Date Committed: 7/24/09-Driv License Revoked
m. Date Committed: 7/24/09- DWI Level 1

In addition to his criminal history and charges in Buncome County, North Carolina, the father has been convicted with or has charges pending for the following in Knox County, Tennessee:

a. Date Committed: 2/19/16- Public Intoxication (guilty plea)
b. Date Committed: 7/4/16- Driving Under the Influence (guilty plea)
c. Date Committed: 5/10/17- Aggravated Assault (pending-bound over to the grand jury)
d. Date Committed: 5/10/17-Aggravated Assault (pending-bound over to the grand jury)
e. Date Committed: 6/28/17-Aggravated Assault-Domestic (pending-bound over to the grand jury)
f. Date Committed: 6/28/17-Aggravated Assault-Domestic (pending-bound over to grand jury)

g. Date Committed: 6/28/17- Alter Item Perm Disting NBRS/Poss of Such (pending-bound over to grand jury)

h. Date Committed: 6/28/17- Possession of Handgun-Convicted Felon (pending-bound over to the grand jury)

i. Date Committed: 6/28/17- Possession of Handgun-Convicted Felon (pending-bound over to the grand jury)

j. Date Committed: 6/28/17-Possession of Handgun-Convicted Felon (pending-bound over to the grand jury)

According to the father, he expects to be released from jail in April of 2018, and the father, who has been incarcerated since June 28, 2017, will begin a program offered in the jail called FOCUS beginning on January 8, 2018.

According to the paternal step-grandmother, she has made numerous attempts to see the child through the mother, but the paternal step-grandmother has never seen the child.

That the child is thriving in the care of the mother for the child's her [sic] entire life and the step-father since November 2016. The Petitioners have sufficient income to provide for the child, have an appropriate home, have no criminal history, and have no history of substance abuse.

II

That there is clear and convincing evidence of wanton disregard by the father. The father's pre-incarceration conduct displayed a wanton disregard for the welfare of the child and the father was served with the Petition while incarcerated. The father has had repeated incarcerations, criminal behavior, a probation violation, and substance abuse issues as shown in his criminal convictions that show wanton disregard for the welfare of the child.

That it is in the best interest of the child for the father's parental rights to be terminated. The father referred to his "wild and woolly days" when he was young, but the Court cannot see that those days have ended. The father has not made a any [sic] adjustment or any lasting adjustment to his circumstances that would make it safe and in the child's best interest to be in his home. The father has not had regular visitation with the child but has only seen her three times. He cancelled the services of one supervising

10

agency, TAG, and Camelot refused to supervise any further visits of the father due to his "tongue." The father could not possibly have a meaningful relationship with the child due to the few times that he has seen her. The effect of the change of caregivers is not an issues [sic] in this case. There is no proof of medical or emotional issues for the child, however, she has thrived in the care of the mother and step-father. There is no proof of mental or physical brutality by the father, though numerous charges are pending for aggravated assault, none of which allege the minor child to be a victim. There is no proof regarding the father's home, though he has been incarcerated for almost six months. The father has a pattern of alcohol abuse without treatment, therefore the Court cannot conclude that he could provide care for the child in a safe a [sic] stable manner. The father has paid some child support, but the amount is not significant. Reviewing each factor set forth by statute to determine what is in the best interest of the child, the Court finds that it is in the best interest of the child for the father's parental rights to be terminated so that the child can have permanency and stability.

Father appeals the termination of his parental rights.

## Discussion

Although not stated exactly as such, Father raises two issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Father's parental rights for abandonment by wanton disregard pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv); and, 2) whether the Juvenile Court erred in finding that clear and convincing evidence was proven that it was in the Child's best interests for Father's parental rights to be terminated.

With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v.*

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted).

12

The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions

of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

The Juvenile Court found that clear and convincing evidence was proven to terminate Father's parental rights for abandonment by wanton disregard pursuant to Tenn. Code Ann. § 36-1-113(g)(1), which provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113 (2017). As pertinent, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\* \* \*

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods

15

of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment; or

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2017).

This Court discussed the ground of abandonment by wanton disregard in *In re Audrey S.* stating:

> Tenn. Code Ann. § 36–1–102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36–1–102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

* * *

16

We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child. *See, e.g., State Dep't of Children's Servs. v. J.M.F.*, No. E2003–03081–COA–R3–PT, 2005 WL 94465, at *7–8 (Tenn. Ct. App. Jan.11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005); *In re C. LaC.*, No. M2003–02164–COA–R3–PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar.17, 2004) (No Tenn. R. App. P. 11 application filed); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d at 474–75.

*In re Audrey S.*, 182 S.W.3d 838, 866-68 (Tenn. Ct. App. 2005) (footnote omitted).

Father argues in his brief on appeal that this case is similar to the case of *In re Dylan M.J.* wherein this Court reversed a trial court's termination of the parental rights of a father who was incarcerated on charges of vehicular assault and violation of probation. *In re Dylan M.J.*, No. M2010-01867-COA-R3-PT, 2011 WL 941404 (Tenn. Ct. App. March 17, 2011), *no appl. perm appeal filed*. The father in *In re Dylan M.J.* had been arrested in 2003 for possession of marijuana for resale and theft of property with a value between $1,000 and $10,000 and had been convicted and placed on probation. *Id*. at *1. In April of 2007, the father went out one night "became intoxicated and was involved in an automobile accident which apparently caused two people to suffer serious injuries." *Id*. at *2. The trial court terminated the father's parental rights based upon the ground of abandonment by wanton disregard. *Id*. at *3.[4] This Court reversed the termination finding that there was no proof whatsoever that the father had ever used marijuana in the presence of the child, that the "child himself testified that he never saw Father drinking beer during visitation," that "despite the regrettable lapses in his behavior, Father has shown a great deal of care and concern for his son, and he has made a genuine effort to establish a meaningful relationship with him," and that the evidence simply did not rise to the level of clear and convincing proof of wanton disregard. *Id*. at *8.

The case now before us is distinguishable from *In re Dylan M.J.* While it is true that the father in *In re Dylan M.J.* and Father in the case now before us both incurred charges for DUI and both had previous criminal charges, this is the extent of the similarities between the two cases. In the case now before us on appeal, Father incurred

---

[4] The trial court also terminated on the ground of abandonment for willfully failing to make payments towards the support of the mother during the four months immediately preceding the child's birth. *Id*. at *3. This Court reversed with regard to this ground finding that no evidence had been presented that the father, who was fifteen years old at the time, was aware of his duty to support or had the ability to support, and, further, that events in the nine years since the birth of the child rendered this ground inapplicable at the time of the filing of the petition. *Id*. at *7.

not only DUI charges, but also incurred multiple other serious criminal charges since January of 2017 when the parties entered into the first mediated agreement allowing Father visitation with the Child. Mere months after entering into the agreement allowing him visitation, Father was arrested and charged with aggravated assault. Father then was arrested a second time approximately one month later and again charged with aggravated assault and with several other charges. Father's conduct is far more egregious than the conduct of the father in *In re Dylan M.J.*

Father also argues in his brief on appeal that the Trial Court erred in considering his conduct prior to the birth of the Child. In support of this assertion, Father cites to a comment contained within the transcript of the trial wherein the Trial Court noted that Father has had multiple DUI charges over the years. As our Supreme Court has stated, however: "the court speaks through its order, not through the transcript." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001). The Trial Court's order, as quoted more fully above, does not show that the Trial Court inappropriately based its decision upon conduct that occurred prior to the birth of the Child. This argument is without merit.

Father also argues in his brief on appeal that with regard to his pending charges Father is innocent until proven guilty, and therefore, the Trial Court should not have considered these charges when considering the ground of wanton disregard. We disagree. As noted in *In re Audrey S.*: "A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *In re Audrey S.*, 182 S.W.3d at 866. Father chose to engage in conduct that carried with it the risk of incarceration, as proven by the fact that Father was indeed incarcerated as a result of his actions, and Father engaged in such conduct on more than one occasion, as proven by the fact that Father was arrested on charges of aggravated assault on both May 10, 2017 and June 28, 2017. While Father ultimately may be found not guilty on his pending charges, there is no question but that he engaged in conduct that carried a risk of incarceration. Furthermore, we note that Father incurred these charges mere months after the parties entered into a mediated agreement allowing Father to meet the Child and exercise visitation.

As already noted, Father relied on the Fifth Amendment and refused to answer some questions about the incidents which resulted in his arrests and the pending charges. As this Court explained in *Levine v. March*:

> Comments regarding a criminal defendant's exercise of his or her Fifth Amendment rights are strictly prohibited by the federal and state constitutions. However, the invocation of the Fifth Amendment privilege in civil cases between private parties calls into play considerations quite different from those pertinent in a criminal case. The United States

Supreme Court has determined that there is no constitutional impediment to drawing an inference against a party invoking his or her Fifth Amendment privilege in a civil case. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); Robert Heidt, *The Conjurer's Circle— The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1110–12 (1982). Accordingly, the majority of jurisdictions, including Tennessee, permit fact-finders to draw adverse inferences against parties who invoke their Fifth Amendment rights in civil case. *See Rachels v. Steele*, 633 S.W.2d 473, 476 (Tenn. Ct. App. 1981); VIII John H. Wigmore, *Evidence* § 2272, at 439 (McNaughton rev.1961).

*Levine v. March*, 266 S.W.3d 426, 442 (Tenn. Ct. App. 2007) (footnote omitted).

Father's incarceration acted "as a triggering mechanism that allow[ed] the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders [Father] unfit or poses a risk of substantial harm to the welfare of the child." *Id*. at 866. Father himself testified at trial that at least one of his aggravated assault charges arose from a domestic incident that occurred in Father's home. Furthermore, the record reveals other evidence of Father's inappropriately aggressive behavior. Mother testified about Father becoming aggressive and frightening her, and Ms. Collier testified about Father's inappropriately aggressive behavior that caused Camelot to terminate Father's visitations. Although Father has not yet been convicted of his pending charges, and those charges could ultimately be dismissed, Father's conduct that led to these pending charges, along with other instances of Father's conduct proven at trial, show a pattern of conduct that poses a risk of substantial harm to the welfare of the Child.

With regard to the grounds for termination, the Juvenile Court specifically found and held:

The father's pre-incarceration conduct displayed a wanton disregard for the welfare of the child and the father was served with the Petition while incarcerated. The father has had repeated incarcerations, criminal behavior, a probation violation, and substance abuse issues as shown in his criminal convictions that show wanton disregard for the welfare of the child.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Juvenile Court's findings. We find no error in the Juvenile Court's finding by clear and convincing evidence that grounds existed to terminate Father's parental rights to the Child for abandonment by wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv).

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence had been proven that it was in the Child's best interests for Father's parental rights to be terminated. With regard to making a determination concerning a child's best interests, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171

S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the case now before us, with regard to best interests the Juvenile Court found and held:

That it is in the best interest of the child for the father's parental rights to be terminated. The father referred to his "wild and woolly days" when he was young, but the Court cannot see that those days have ended. The father has not made any adjustment or any lasting adjustment to his circumstances that would make it safe and in the child's best interest to be in his home. The father has not had regular visitation with the child but has only seen her three times. He cancelled the services of one supervising agency, TAG, and Camelot refused to supervise any further visits of the father due to his "tongue." The father could not possibly have a meaningful relationship with the child due to the few times that he has seen her. The effect of the change of caregivers is not an issues [sic] in this case. There is no proof of medical or emotional issues for the child, however, she has thrived in the care of the mother and step-father. There is no proof of mental or physical brutality by the father, though numerous charges are pending for aggravated assault, none of which allege the minor child to be a victim. There is no proof regarding the father's home, though he has been incarcerated for almost six months. The father has a pattern of alcohol abuse without treatment, therefore the Court cannot conclude that he could provide care for the child in a safe a [sic] stable manner. The father has paid some child support, but the amount is not significant. Reviewing each factor set forth by statute to determine what is in the best interest of the child, the Court finds that it is in the best interest of the child for the father's parental rights to be terminated so that the child can have permanency and stability.

Father argues in his brief on appeal that he never had a chance to get to know the Child "primarily because of the actions of the Mother." We agree that Father has not gotten to know the Child, but we disagree that this is due primarily to Mother's actions. The parties entered into an agreement in January of 2017 allowing Father visitation with

the Child. After only a few visitations, Father cancelled the services of TAG for no good reason and then engaged in conduct that was inappropriately aggressive causing Camelot to terminate its visitation services. Thus, Father alone was the cause of the visitations being terminated. The record reveals that Father then took no steps to attempt to obtain further visitation. Furthermore, mere weeks after the visitation that he had exercised, Father engaged in conduct that resulted in his being arrested and incarcerated, which is where he remained at the time of trial. The reality that Father has not been able to get to know the Child rests primarily upon the actions of Father.

The Juvenile Court considered the relevant statutory factors contained in Tenn. Code Ann. § 36-1-113(i) when making its determination that it was in the Child's best interests for Father's parental rights to be terminated. The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Juvenile Court's findings made by clear and convincing evidence. We find no error in the Juvenile Court's finding that it was in the Child's best interests for Father's parental rights to be terminated.

Having found that grounds were proven to terminate Father's parental rights to the Child for abandonment by wanton disregard and that it was proven that it is in the Child's best interests for Father's parental rights to be terminated, we affirm the Juvenile Court's January 24, 2018 order terminating Father's parental rights to the Child.

### Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Adam R. P.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

22